# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KARA DANELL VIZCARRONDO, *o/b/o* J.J.V., | |
| Plaintiff, | CIVIL ACTION NO. 3:20-CV-02367 |
| v. | (MEHALCHICK, M.J.) |
| KILOLO KIJAKAZI,[1] | |
| Defendant. | |

## MEMORANDUM

Plaintiff Tabitha A. Vizcarrondo ("Vizcarrondo") brings this action on behalf of her minor son ("J.J.V.") under section 1631(c) of the Social Security Act, 42 U.S.C. § 1383(c) for judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Childs' Supplemental Security Income ("SSI") on behalf of J.J.V. under Title XVI of the Social Security Act. (Doc. 1). For the following reasons, the Commissioner's decision will be **AFFIRMED**.

## I.   BACKGROUND AND PROCEDURAL HISTORY

On February 19, 2019, Vizcarrondo filed an application for benefits under Title XVI of the Social Security Act on behalf of J.J.V. for SSI benefits alleging an onset date of March 1, 2019. (Doc. 12-2, at 13). Vizcarrondo's application for benefits was initially denied on May

---

[1] The Court has amended the caption to replace, as the named defendant, Social Security Commissioner Andrew M. Saul, with his successor, Social Security Commissioner Kilolo Kijakazi. See Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

7, 2019, and Vizcarrondo filed a timely request for a hearing, which Administrative Law Richard E. Guida ("ALJ") held on March 12, 2020. (Doc. 12-2, at 13). In a May 27, 2020, written decision, the ALJ determined that J.J.V. is not disabled and therefore not entitled to benefits or income under Title XVI. (Doc. 12-2, at 19). On October 21, 2020, the Appeals Council subsequently denied Vizcarrondo's request for review. (Doc. 12-2, at 2).

On December 17, 2020, Vizcarrondo commenced the instant action. (Doc. 1). The Commissioner responded on June 23, 2021, providing the requisite transcripts from J.J.V.'s disability proceedings. (Doc. 11; Doc. 12). The parties then filed their respective briefs, with Vizcarrondo raising two principal bases for reversal or remand. (Doc. 19; Doc. 22). This matter is now ripe for decision.

## II.     STANDARD OF REVIEW

Resolution of the instant social security appeal involves an informed consideration of the respective roles of two adjudicators–the ALJ and the Court. At the outset, it is the responsibility of the ALJ in the first instance to determine whether a claimant has met the statutory prerequisites for entitlement to benefits. A claimant under the age of 18 ("child") shall be considered disabled under Title XVI of the Social Security Act if she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I); 20 C.F.R. §416.906. Notwithstanding the above, no child who engages in substantial gainful activity, as defined by the Social Security regulations, may be found disabled. 42 U.S.C. § 1382c(a)(3)(C)(ii); 20 C.F.R. §416.906.

The ALJ employs a three-step evaluation process to determine whether a child is eligible for SSI payments because of disability. As part of this analysis, the ALJ must sequentially determine: (1) whether the child is engaged in substantial gainful activity; (2) whether the child has a medically determinable, severe impairment; (3) whether the child's impairment or combination of impairments meets, medically equals, or functionally equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.924. If the ALJ finds that the child is not disabled at any point in the sequence, review does not proceed further. 20 C.F.R. § 416.924.

In determining functional equivalence, the ALJ evaluates the following six domains of functioning: (1) acquiring and using information; (2) attending to and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) ability to care for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). An impairment is functionally equal to a listed impairment when it results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). A marked limitation is more than moderate but less than extreme. 20 C.F.R. § 416.926a(e)(2)(ii). An impairment that only meets some of the criteria of a listed impairment, "no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see also Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992).

When reviewing the denial of disability benefits, the Court's review is limited to determining whether those findings are supported by substantial evidence in the administrative record. *See* 42 U.S.C. § 405(g) (sentence five); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

    "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D. Pa. 2003). The question before the Court, therefore, is not whether J.J.V. is disabled, but whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

In reviewing the ALJ's decision, the Court is not permitted to weigh the evidence or substitute its own conclusions for those reached by the ALJ. *See Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). Rather, the court reviews the ALJ's findings to determine whether they were supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Substantial evidence is evidence that a "reasonable mind might accept as adequate to support a conclusion." *Rutherford*, 399 F.3d at 552 (internal quotations omitted). "It is 'more than a mere scintilla but may be somewhat less than a preponderance of the evidence.'" *Rutherford*, 399 F.3d at 552 (quoting *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971)). If the decision of the ALJ is supported by substantial evidence, the Court may not set it aside "even if [the Court] would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).

For effective judicial review to take place, the court "need[s] from the ALJ not only an expression of the evidence he considered which supports the result, but also some indication of the evidence which was rejected. In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

### III.   THE ALJ'S DECISION

The ALJ proceeded through the three-step sequential evaluation process to determine whether J.J.V., as an individual under the age of eighteen (18), is disabled. 20 C.F.R. § 416.924(a); (Doc. 12-2, at 14-19). At step one, the ALJ concluded that J.J.V. has not been engaged in any substantial gainful activity since his application date of February 19, 2019. (Doc. 12-2, at 14). The ALJ then proceeded to step two and determined that J.J.V. has the following severe impairment: lymphoma. (Doc. 12-2, at 14). Next, at step three, the ALJ

determined that J.J.V. does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1. (Doc. 12-2, at 14). Specifically, the ALJ considered Listings 113.05 - Lymphoma. (Doc. 12-2, at 14).

In determining step three, the ALJ addressed the six domains of functioning and concluded that J.J.V. does not have an impairment or combination of impairments that functionally equals the severity of one of the listed impairments. (Doc. 12-2, at 14-18). The ALJ concluded that J.J.V. has: (1) no limitation in acquiring and using information; (2) no limitation in attending and completing tasks; (3) no limitation in interacting and relating with others; (4) no limitation in moving about and manipulating objects; (5) no limitation in the ability to care for himself; and (6) a marked limitation in health and physical well-being. (Doc. 12-2, at 15). Based on this analysis, the ALJ concluded that J.J.V. has not been disabled, as defined by the Social Security Act, since February 19, 2019, the date the application was filed. (Doc. 12-2, at 19).

## IV.     DISCUSSION

Vizcarrondo raises two issues on appeal. (Doc. 19, at 1-2). First, she contends that the ALJ "erred and abused his discretion by failing to properly consider [J.J.V.'s] limitations under the Functional Domains, when considering [his] . . . severe impairment" of Hodgkin's Lymphoma. (Doc. 19, at 1). Additionally, Vizcarrondo asserts that the ALJ erred in relying on the findings of the State Agency Consultants as opposed to the findings in the Childhood Disability Evaluation Form from J.J.V.'s treating pediatric oncologist, Dr. Jennifer Kovatch. (Doc. 19, at 1-2). The Commissioner argues that substantial evidence supports the ALJ's

decision. (Doc. 22, at 1). The Court concludes that substantial evidence supports the ALJ's decision.

   A.  Substantial evidence supports the ALJ's decision that J.J.V.'s severe impairments do not functionally equal a listing.

First, Vizcarrondo argues that "[t]he ALJ erred and abused his discretion by failing to properly consider [J.J.V.'s] limitations under the Functional Domains, when considering [his] severe impairment" of Hodgkin's Lymphoma. (Doc. 19, at 1). Vizcarrondo contends the limitations caused by J.J.V.'s severe impairments are consistent with an extreme limitation in the domain of (1) health and physical well-being and at least marked limitations in the domains of (2) moving about and manipulating objects and (3) caring for oneself. (Doc. 19, at 16). To the extent Vizcarrondo asks the Court to re-weigh the record evidence or make new factual findings, the Court may not invade the ALJ's province as a finder of fact in disability proceedings, for "our inquiry is not whether an alternate conclusion would have been reached, but whether substantial evidence supported the ALJ's decision." *See Daub v. Colvin*, No. 3:15-CV-1066, 2015 WL 8013037, at *9 (M.D. Pa Dec. 7, 2015). Substantial evidence supports the ALJ's findings that J.J.V. has no limitation in the domains of (1) caring for oneself and (2) moving about and manipulating objects and a marked limitation in the domain of (3) health and physical well-being. (Doc. 12-2, at 5).

Vizcarrondo argues that J.J.V.'s medical records, school records, and her testimony demonstrate marked and extreme limitations in the aforementioned domains. (Doc. 19, at 15-17). Further, Vizcarrondo claims that the ALJ erred in failing to consider J.J.V.'s ongoing weakness and the various impact his Hodgkin's Lymphoma had on his ability to function along with the ailments J.J.V. suffered from prior to his Lymphoma diagnosis, treatment, and

side effects. (Doc. 19, at 17). Additionally, Vizcarrondo claims that the ALJ erred by failing to consider whether a partially favorable decision for a closed period of time should have been awarded due to J.J.V.'s impairments.[2] (Doc. 19, at 18).

The ALJ specifically addressed Vizcarrondo's testimony and considered J.J.V.'s medical records, school records, symptoms, treatment, and side effects when assessing J.J.V.'s functional domains. (Doc. 12-2, at 16-17).

───────────────

[2] Vizcarrondo argues that "[t]he ALJ erred by failing to properly consider whether this claim should be awarded as a Partially Favorable Decision, for a closed period of time, due to the limitations from [J.J.V.'s] treatment for his Hodgkin's Lymphoma." (Doc. 19, at 18). Specifically, Vizcarrondo contends that J.J.V. had "significant limitations for a period lasting at least one year" from his diagnosis through his recovery. (Doc. 19, at 18). The Commissioner argues that a closed period of disability was unwarranted because, within four months of filing the disability application, J.J.V. had entered remission for his lymphoma. (Doc. 22, at 16-17).

The ALJ considered evidence from J.J.V.'s initial diagnosis on December 5, 2018, through the date of the decision on March 27, 2020. (Doc. 12-2, at 16, 19). The ALJ noted J.J.V.'s diagnosis of Hodgkin lymphoma, the biopsy that was performed on December 5, 2018, and the PET CT scan that was performed in January 2019. (Doc. 12-2, at 16). The ALJ also discussed J.J.V.'s continued recovery including his need to undergo interval evaluations for five years. (Doc. 12-2, at 17). However, the ALJ also noted the progress J.J.V. has made during his recovery, that his treating oncologist did not indicate a need for any significant treatment during the time of her opinion, and that he is now in remission. (Doc. 12-2, at 17). The ALJ found that J.J.V. "has not been disabled . . . since February 19, 2019" and included medical evidence from the date of J.J.V.'s initial diagnosis through his most recent CT scan in August 2019 indicating complete remission. (Doc. 12-2, at 16, 19); *see infra*. In making this determination, the ALJ considered the entire record, not just evidence from J.J.V.'s period of improvement. *See C.T. v. Comm'r of Soc. Sec.,* No. CV 20-03674 (RBK), 2021 WL 4398663, at *6 (D.N.J. Sept. 27, 2021). Thus, the ALJ cited to substantial evidence when assessing J.J.V.'s impairments from his diagnosis through his recovery.

**1. Substantial evidence supports the ALJ's finding that J.J.V. has a marked limitation in the functional domain of health and physical well-being.**

Vizcarrondo argues that the ALJ erred in finding that J.J.V. suffers from a marked limitation in his health and physical well-being. (Doc. 19, at 16). The regulations on the domain of health and physical well-being explain the evaluation criteria, in pertinent part, as follows: "In this domain, we consider the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on your functioning that we did not consider in [the domain of moving about and manipulating objects]." 20 C.F.R. §§ 416.926a(l). "Unlike the other five domains of functional equivalence, which address a child's abilities, this domain does not address typical development and functioning. The 'Health and Physical Well-Being' domain addresses how recurrent illness, the side effects of medication, and the need for ongoing treatment affect the child's health and sense of physical well-being." *Cynthia W. on behalf of T.C. v. Kijakazi*, No. 2:19-CV-15806, 2021 WL 4520380, at *9 (D.N.J. Oct. 4, 2021) (quoting 20 CFR 416.929a(l); SSR 09-8p).

Vizcarrondo argues that J.J.V.'s identified severe impairments of Lymphoma warrant a finding of an extreme limitation in the functional domain of health and physical well-being. (Doc. 19, at 16). However, the ALJ addressed J.J.V.'s Lymphoma through substantial evidence from the record in deciding that he has a marked limitation on his health and physical well-being. (Doc. 12-2, at 16-17).

The ALJ considered Vizcarrondo's testimony and childhood disability form, the opinions of Dr. Kovatch and the State Agency medical consultants, and the objective medical evidence. (Doc. 12-2, at 16-18).

The ALJ found that

The record reveals [J.J.V.], who was age 12 at the time of the hearing, has been diagnosed with nodular lymphocyte-predominant Hodgkin lymphoma, Stage 3, for which he underwent an excisional biopsy on December 5, 2018 that showed a nodular lymphocyte predominant Hodgkin lymphoma and a staging PET CT scan on January 2019 that confirmed the biopsy impression (Exhibits 4F; 14F; 15F; 22F). Subsequently, [J.J.V.] underwent four (4) cycles of chemotherapy treatment beginning February 7, 2019 through April 14, 2019 (Exhibits 9F-13F; 19F; 22F; Hearing Testimony). [Vizcarrondo] testified [J.J.V.] had problems handling conditions resulting from chemotherapy treatment, including hair loss, memory loss, and pain in the feet and hands. The April 2019 oncology evaluation reports indicated [J.J.V.] experienced post-chemotherapy induced nausea and vomiting (Exhibit 13F). The record reveals [J.J.V.] also suffered from a compromised immune system due to chemotherapy treatment, resulting in viral respiratory issues, for which he was prescribed steroids (Exhibits 9F-13F; 14F; Hearing Testimony). However, the April 2019 oncology records further indicated [J.J.V.] reported to be otherwise doing well, with the return of normal appetite and activity within two (2) days of treatment (Exhibit 13F/15). Further, while [Vizcarrondo] testified [J.J.V.] had also problems with fatigue and anemia associated with chemotherapy treatment, she further indicated that these symptoms improved after chemotherapy treatment ended. The medical records reveal [J.J.V.'s] end of therapy PET CT scan was performed on May 1, 2019 and the results showed complete remission (Exhibit 19F). [J.J.V.] had his mediport removed in June 2019 (Exhibit 19F). The most recent CT scan in August 2019 showed no indication of recurrent lymphadenopathy (Exhibit 19F/4; 9; 23- 24). While [Vizcarrondo] testified [J.J.V.'s] nodules have grown, she further testified that a more recent biopsy has not been performed as they have not grown large enough (Hearing Testimony). On the childhood disability form dated March 10, 2020, [J.J.V.'s] oncologist noted that [J.J.V.] will continue to undergo interval evaluation on a scheduled basis for five (5) years, but she did not indicate any need for additional significant treatment at that time (Exhibits 22F).

(Doc. 12-2, at 16-17).

First, the ALJ considered J.J.V.'s treatment for lymphoma including four cycles of chemotherapy treatment, and the side effects from which he suffered. (Doc. 12-2, at 16). The ALJ found that J.J.V.'s symptoms were supported by objective medical evidence and Vizcarrondo's testimony. (Doc. 12-2, at 16; Doc. 12-9, at 77-164; Doc. 12-10, at 3-34; Doc. 12-19, at 48-69; Doc. 12-20, at 82-87). Specifically, the ALJ considered Vizcarrondo's

testimony that J.J.V. "had problems handling conditions resulting from chemotherapy treatment, including hair loss, memory loss, and pain in the feet and hands" and an oncology evaluation report that demonstrated J.J.V.'s "post-chemotherapy induced nausea and vomiting" along with a compromised immune system which resulted in respiratory issues. (Doc. 12-2, at 16, 32; Doc. 12-10, at 20; Doc. 12-11, at 56). However, the ALJ also noted that while undergoing chemotherapy treatment, other than the above-mentioned side effects, J.J.V. was doing well with a return of a normal appetite and actives within two days of treatment. (Doc. 12-2, at 16; Doc. 12-15, at 57). The ALJ also considered J.J.V.'s symptoms after he had completed his chemotherapy treatment. (Doc. 12-2, at 16). The ALJ noted Vizcarrondo's testimony that J.J.V.'s fatigue and anemia improved once his chemotherapy treatment ended. (Doc. 12-2, at 16, 36). Further, the ALJ mentioned that J.J.V.'s medical records demonstrate complete remission on May 1, 2019, and in his most recent CT scan in August 2019. (Doc. 12-2, at 16; Doc. 12-19, at 10, 54). The ALJ noted that J.J.V. has had his mediport removed and that his treating oncologist, Dr. Kovatch, did not indicate a need for significant treatment at the time although J.J.V. will need to undergo evaluations over the next five years. (Doc. 12-2, at 16-17; Doc. 12-19, at 54; Doc. 12-20, at 87).

The ALJ also considered the opinions of Dr. Popat and Dr. Draper when discussing J.J.V.'s limitations in his health and physical well-being. (Doc. 12-2, at 17-18). First, the ALJ found Dr. Popat's opinion that J.J.V. suffered from a marked limitation in health and physical well-being persuasive. (Doc. 12-2, at 17; Doc. 12-3, at 6). Specifically, the ALJ compared Dr. Popat's opinion with the other record evidence and noted that J.J.V. is in remission, that he did not have any pain associated with his biopsy scar, and no issues with illness, constipation, nausea, weight loss, or fevers at that time, and the oncology progress notes indicate J.J.V.'s

improvement of symptoms related to chemotherapy treatment after the treatment ended. (Doc. 12-2, at 17). Next, the ALJ considered the opinion of Dr. Draper and found his opinion that J.J.V. has a less than marked limitation in health and physical well-being unpersuasive noting that J.J.V.'s history of treatment for lymphoma, symptoms related to chemotherapy treatment, and continued need for routine evaluations demonstrated a more extensive limitation. (Doc. 12-2, at 18; Doc. 12-3, at 17).

Thus, the ALJ considered substantial evidence regarding J.J.V.'s limitations when he determined that J.J.V. has a marked limitation in the functional domain of health and physical well-being. (Doc. 12-2, at 16); *see Morrison ex rel. Morrison v. Comm. of Soc. Sec.,* 268 F. App'x 186, 190 (3d Cir. 2008) (finding that the ALJ's opinion cited to substantial evidence in his finding regarding the domain of health and physical well-being when the ALJ referenced the child's severe impairments, gave substantial weight to a medical opinion, and acknowledged various side effects of his impairments along with the mitigation techniques employed by the claimant); *see also Bailey ex rel. J.L.M. v. Comm. Of Soc. Sec.,* No. 12-cv-13159, 2013 WL 2295734, at *10 (E.D. Mich. May 24, 2013) (affirming ALJ's opinion that claimant had less than marked limitation in the domain of health and physical well-being when considering his lymphoma when his symptoms had improved, he had completed chemotherapy treatment, and was in remission).

### 2. Substantial evidence supports the ALJ's finding that J.J.V. has no limitation in the functional domain of moving about and manipulating objects.

Vizcarrondo argues that the ALJ erred in finding that J.J.V. suffers from no limitation in moving about and manipulating objects. (Doc. 19, at 16). The regulations outline the evaluation criteria for the domain of moving about and manipulating objects as follows:

In this domain, we consider how you move your body from one place to another and how you move and manipulate things. These are called gross and fine motor skills.

. . .

As a school-age child, your developing gross motor skills should let you move at an efficient pace about your school, home, and neighborhood. Your increasing strength and coordination should expand your ability to enjoy a variety of physical activities, such as running and jumping, and throwing, kicking, catching and hitting balls in informal play or organized sports. Your developing fine motor skills should enable you to do things like use many kitchen and household tools independently, use scissors, and write.

20 C.F.R. §§ 416.926a(j); (j)(2)(iv).

Vizcarrondo argues that J.J.V.'s identified severe impairment of Lymphoma warrants a finding of marked limitations in the functional domain of moving about and manipulating objects. (Doc. 19, at 16). However, the ALJ addressed J.J.V.'s Lymphoma through substantial evidence from the record in deciding that he has no limitation in his ability to move about and manipulate objects. (Doc. 12-2, at 16-17). The ALJ considered Vizcarrondo's testimony and J.J.V.'s ability to engage in activities. (Doc. 12-2, at 17).

The ALJ considered Vizcarrondo's testimony that J.J.V. can walk, run, throw a ball, ride a bike, jump rope, use roller skates or roller blades, swim, use scissors, work video game controls, and dress/undress dolls or action figures but that he is not able "to be too active because of his" lymphoma. (Doc. 12-2, at 16; Doc. 12-6, at 9). Further, the ALJ noted that J.J.V. was at the usual baseline for indoor activities and was able to attend vacations. (Doc. 12-2, at 17; Doc. 12-19, at 48).

The ALJ also considered the opinions of Dr. Popat and Dr. Draper when discussing J.J.V.'s limitations in his functional domain of moving about and manipulating objects and found them both persuasive. (Doc. 12-2, at 17-18; Doc. 12-3, at 6, 17). The ALJ stated that

the opinions of Dr. Popat and Dr. Draper were consistent with J.J.V.'s ability to go on vacation and Vizcarrondo's testimony regarding J.J.V.'s motor functions and physical activity. (Doc. 12-2, at 17-18).

Finally, the ALJ considered the opinion of Dr. Kovatch that J.J.V. had marked limitations in the functional domain of moving about and manipulating objects and found that it was inconsistent with the record. (Doc. 12-2, at 18). Dr. Kovatch stated that J.J.V. was "unable to ambulate at will due to the severe side effects of chemotherapy, fatigue, and anemia." (Doc. 12-20, at 85). However, the ALJ noted that Dr. Kovatch opinion was limited to January 2, 2019, to April 1, 2019, and that J.J.V. had completed chemotherapy on April 14, 2019, had his mediport removed on June 14, 2019, and was in complete remission on August 7, 2019. (Doc. 12-2, at 18; Doc. 12-19, at 54). Further, the ALJ stated that J.J.V. was able to take trips and spent a week at Disney. (Doc. 12-2, at 18). Thus, the ALJ explained why he did not find Dr. Kovatch's opinion persuasive as her opinion was based on side effects from chemotherapy and J.J.V. has completed his chemotherapy treatments and is now in remission. (Doc. 12-2, at 18).

The ALJ also adequately explained his decision because he gave "not only an expression of the evidence he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705. Thus, the ALJ considered substantial evidence regarding J.J.V.'s limitations when he determined that J.J.V. has no limitations in the functional domain of moving about and manipulating objects. (Doc. 12-2, at 17).

- 14 -

**3. Substantial evidence supports the ALJ's finding that J.J.V. has no limitation in the functional domain of caring for himself.**

Vizcarrondo argues that the ALJ erred in finding that J.J.V. has no limitation in the ability to care for himself. (Doc. 19, at 16). The regulations on the domain of caring for yourself explain the evaluation criteria, in pertinent part, as follows:

> In this domain, we consider how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions, and living area.

> School-age children (age 6 to attainment of age 12). You should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely. You should begin to recognize that you are competent in doing some activities and that you have difficulty with others. You should be able to identify those circumstances when you feel good about yourself and when you feel bad. You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. You should begin to demonstrate consistent control over your behavior, and you should be able to avoid behaviors that are unsafe or otherwise not good for you. You should begin to imitate more of the behavior of adults you know.

> 20 C.F.R. §§ 416.926a(k); (k)(2)(iv).

Vizcarrondo argues that J.J.V.'s identified severe impairment of Lymphoma warrants a finding of marked limitations in the functional domain of caring for oneself. (Doc. 19, at 16). However, the ALJ addressed J.J.V.'s Lymphoma through substantial evidence from the record in deciding that he has no limitation in his ability to care for himself. (Doc. 12-2, at 16-17). The ALJ considered Vizcarrondo's testimony regarding J.J.V.'s ability to care for himself, perform chores, interact with others, follow instructions, engage in activities, and his performance in school. (Doc. 12-2, at 17).

- 15 -

First, the ALJ considered Vizcarrondo's testimony that J.J.V. could interact and get along with others, take a bath or shower without assistance, brush his teeth, eat by himself use utensils, pick up and put away toys, hang up clothes, assist with household chores, follow instructions, and obey rules however he has problems with choosing clothes to wear. (Doc. 12-2, at 17; Doc. 12-6, at 11). Further, the ALJ noted that J.J.V. was at the usual baseline for indoor activities and was able to attend vacations. (Doc. 12-2, at 17; Doc. 12-19, at 48).

The ALJ also considered the medical opinions of Dr. Popat and Dr. Draper and found that their opinion that J.J.V. had no limitation in caring for himself was persuasive. (Doc. 12-2, at 17-18; Doc. 12-3, at 6, 17). The ALJ noted that the opinions of Dr. Popat and Dr. Draper were consistent with Vizcarrondo's testimony that J.J.V. has no problem taking a bath or shower without assistance, brushing his teeth, eating by himself using utensils, picking up and putting away toys, hanging up clothes, and assisting with doing household chores. (Doc. 12-2, at 17-18).

Finally, the ALJ considered the opinion of Dr. Kovatch that J.J.V. had extreme limitations in the functional domain of caring for himself and found that it was inconsistent with the record. (Doc. 12-2, at 18). Dr. Kovatch stated that J.J.V. "requires parental assistance for self care, medication administration, [and] activities of daily life." (Doc. 12-20, at 85). However, the ALJ previously considered Vizcarrondo's testimony that J.J.V. could conduct self-care without assistance and that he was able to engage in the activities of daily life like doing chores, attending school, playing sports, and taking trips. (Doc. 12-2, at 17-18). Further, the ALJ noted that Dr. Kovatch's opinion was limited to when J.J.V. was not in remission and was still undergoing chemotherapy treatment. (Doc. 12-2, at 18).

Thus, the ALJ considered substantial evidence regarding J.J.V.'s limitations when he determined that J.J.V. has no limitations in the functional domain of caring for oneself. (Doc. 12-2, at 17).

B. SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S CONSIDERATION OF DR. KOVATCH'S OPINION.

Vizcarrondo contends that "[t]he ALJ erred and abused his discretion by [failing to rely upon] the opinions offered in the Childhood Disability Evaluation Form from [J.J.V.'s pediatric oncologist] Dr. [Jennifer] Kovatch." (Doc. 19, at 20).

The ALJ adequately considered the opinion of Dr. Kovatch, MD. (Doc. 12-2, at 18; Doc. 12-20, at 83). As this matter involves a claim filed after March 27, 2017, the new regulatory framework governing the evaluation of medical opinions applies to the ALJ's evaluation of the medical opinions in the record. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15,132-01 (Mar. 27, 2017)); *see also* 82 Fed. Reg. 15263 (March 27, 2017); 82 Fed. Reg. 16869 (corrective notice) (explaining that SSR 96-2p and 96- 5p do not apply to newly filed or pending claims after March 27, 2017). Under the new regulations, rather than assigning weight to medical opinions, the Commissioner will articulate "how persuasive" he or she finds the medical opinions. 20 C.F.R. § 404.1520c(b). The Commissioner's consideration of medical opinions is guided by the following factors: supportability; consistency; relationship with the claimant (including the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship); specialization of the medical source; and any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1520c(c).

The most important of these factors is the "supportability" of the opinion and the "consistency" of the opinion. 20 C.F.R. § 404.1520c(b)(2).

The ALJ must explain how he or she considered the "supportability" and "consistency" of a medical source's opinion. 20 C.F.R. § 404.1520c(b)(2). Generally, the ALJ may, but is not required to, explain his or her consideration of the other factors, but if there are two equally persuasive medical opinions about the same issue that are not exactly the same, then the ALJ must explain how he or she considered the other factors. 20 C.F.R. § 404.1520c(b)(3). To facilitate judicial review, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests" and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Cotter*, 642 F.2d at 704, 706-707. An ALJ need not undertake an exhaustive discussion of all the evidence or "use particular language or adhere to a particular format in conducting his analysis." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004); *see Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004) ("There is no requirement that the ALJ discuss in his opinion every tidbit of evidence included in the record."). However, an ALJ must ensure "sufficient development of the record and explanation of findings to permit meaningful review." *Jones*, 364 F.3d at 505; *see, e.g., Rivera v. Comm'r of Soc. Sec.*, 164 F. App'x 260, 262 (3d Cir. 2006) ("The only requirement is that, reading the ALJ's decision as a whole, there must be sufficient development of the record and explanation of findings.").

The ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 416.920c(a). The opinion of Dr. Kovatch is an acceptable medical source as she is J.J.V.'s treating oncologist and a medical doctor.

(Doc. 12-20, at 61); 20 C.F.R. § 416.902(a)(1). However, under the new regulations, treating physicians are "not entitled to any deference given [his or her] status as [a] 'treating physicia[n].'" *See Duhl v. Kijakazi,* No. 20-1123, 2021 WL 5909819, at *3 (W.D. Pa. Dec. 14, 2021).

Vizcarrondo argues that as J.J.V.'s treating physician, the ALJ failed to properly consider Dr. Kovatch's opinion and instead relied on the opinions of the two State Agency Medical Consultants, Dr. Draper and Dr. Popat, whose opinions were based upon insufficient evidence. (Doc. 19, at 22-23). Further, Vizcarrondo claims that although Dr. Kovatch's findings are limited to time period of January 2, 2019, to April 14, 2019, her opinions should be considered as part of the overall medical record. (Doc. 19, at 22-23). The Commissioner argues that the ALJ adequately explained his determinations that the opinions of Dr. Popat and Dr. Draper were persuasive and that the opinion of Dr. Kovatch was not. (Doc. 22, at 19-20). Specifically, the Commissioner argues that Dr. Kovatch's opinion only includes a four-month period and it does not "satisfy the required 12-month durational requirement." (Doc. 22, at 20). Further, the Commissioner contends that the ALJ explained how Dr. Kovatch's opinion was not supported or consistent with the record including her own treatment records demonstrating the remission of J.J.V.'s cancer, the lack of a need for additional significant treatment following the completion of chemotherapy, J.J.V.'s return to school, and J.J.V.'s enjoyment of trips and amusement parks. (Doc. 22, at 21-22).

The ALJ considered the opinion of Dr. Kovatch and found that her opinion was not persuasive. (Doc. 12-2, at 18). The ALJ stated

> The March 10, 2020 opinion of treating oncologist, Jennifer Kovatch, MD, is not persuasive (Exhibit 22F). Dr. Kovatch opined marked/extreme limitations. However, she indicated that her opined limitations only apply to the time

period of January 2, 2019 to April 14, 2019 (Id. at 7). This is less than 12 months. With a file date of February 19, 2019, there is no period of 12 months or more. Furthermore, Dr. Kovatch noted that [J.J.V.] completed chemotherapy on April 14, 2019 (Id.). On August 7, 2019, Dr. Kovatch noted that [J.J.V.] was in complete remission and that the mediport was removed on June 14, 2019 (Exhibit 19F/9). Also, on August 7, 2019, Dr. Kovatch noted that [J.J.V.] visited Myrtle Beach and Dorney Park during the Summer of 2019 (Exhibit 19F/3). On February 5, 2020, Dr. Kovatch noted that [J.J.V.] spent week at Disney in December 2019 (Exhibit 21F/12). Dr. Kovatch noted that [J.J.V.] has been sleeping well and enjoys being back in school (Id.).

(Doc. 12-2, at 18; Doc. 12-19, at 48, 54; Doc. 12-20, at 41, 82-87).

Although the ALJ did not explicitly state the words "consistent" or "supported" it is clear from his opinion that such factors were considered. *See Jones*, 364 F.3d at 505. The ALJ noted Dr. Kovatch's opinion that J.J.V. has marked or extreme limitations in each domain. (Doc. 12-2, at 18; Doc. 12-20, at 84-86). However, the ALJ also considered Dr. Kovatch's findings that J.J.V. had completed chemotherapy, was in complete remission, that his mediport was removed, and that J.J.V. had been enjoying various activities such as trips to the beach and amusement park and his return to school. (Doc. 12-2, at 18; Doc. 12-19, at 48, 54). The ALJ discussed evidence in the record he found conflicting with Dr. Kovatch's opinion that J.J.V. suffered from marked or extreme limitations in each domain. (Doc. 12-2, at 18). Further, the ALJ noted that Dr. Kovatch's opinion spanned from January 2, 2019, to April 14, 2019, which is less than the required 12-month durational period. (Doc. 12-2, at 18; Doc. 12-20, at 87).

Thus, the ALJ adequately discussed the opinion of Dr. Kovatch and compared it with the other evidence in the record finding that the opinion was not persuasive. (Doc. 12-2, at 18; Doc. 12-20, at 82-87).

- 20 -

The ALJ also explained his reasoning in finding the opinion of Dr. Popat, a State Agency medical consultant, persuasive. (Doc. 12-2, at 18). The ALJ explained that Dr. Popat's opinion that J.J.V. has no limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself, and a marked limitation in health and physical well-being was

> consistent with and supported by the record, including the most recent CT scan indicating [J.J.V.'s] condition is in remission, [J.J.V.'s] ability to achieve honor roll while receiving at home instruction, the August 2019 oncology progress notes indicating [J.J.V.] was able to go on vacations during the summer of 2019 and that he did not have any pain associated with his biopsy scar and no issues with illness, constipation, nausea, weight loss or fevers at that time, and the oncology progress notes indicating [J.J.V.'s] improvement of symptoms related to chemotherapy treatment after the treatment had ended. Moreover, [Vizcarrondo] reported that [J.J.V.] has no problems zipping and buttoning clothes, tying shoelaces, taking a bath or shower without assistance, brushing his teeth, eating by himself using utensils, picking up and putting away toys, hanging up clothes, assisting with doing household chores, following instructions, obeying rules, getting to school on time, and accepting criticism or correction.

(Doc. 12-2, at 17-18; Doc. 12-3, at 5-6).

Additionally, the ALJ adequately considered the opinion of Dr. Draper and explained why he found the opinion persuasive. (Doc. 12-2, at 18). Specifically, the ALJ noted that Dr. Draper's opinion that J.J.V. has no limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself was

> supported by and consistent with the record, including the most recent CT scan results showing complete remission, and the oncology progress notes indicating [J.J.V.] was able to take family vacations in the summer of 2019. Moreover, [Vizcarrondo] reported that [J.J.V.] has no problems zipping and buttoning clothes, tying shoelaces, taking a bath or shower without assistance, brushing his teeth, eating by himself using utensils, picking up and putting away toys, hanging up clothes, assisting with doing household chores, following

instructions, obeying rules, getting to school on time, and accepting criticism or correction.

(Doc. 12-2, at 18; Doc. 12-3, at 15-19).

Further, the ALJ explained that J.J.V.'s limitations in health and physical well-being are more extensive than Dr. Draper opined noting J.J.V.'s

> history of treatment for lymphoma, including an excisional biopsy on December 5, 2018 that showing a nodular lymphocyte predominant Hodgkin lymphoma, a staging PET CT scan on January 2019 that confirmed the biopsy impression, and four (4) chemotherapy treatments from February 2019 through April 2019, the medical records indicating [J.J.V.] experienced symptoms related to chemotherapy treatment, and the need for ongoing oncology evaluation over a five (5) year period.

(Doc. 12-2, at 18; Doc. 12-3, at 15-19).

The ALJ explicitly explained the consistency and supportability of the opinions of the State Agency consultants Dr. Popat and Dr. Draper in comparison to the record. (Doc. 12-2, at 17-18). Thus, substantial evidence supports the ALJ's use of Dr. Popat and Dr. Draper's opinions.

The ALJ clearly utilized and discussed Dr. Kovatch's opinion and response to the Childhood Disability Evaluation Form in his opinion and the court may not reweigh the evidence in its determination. *See Burns*, 312 F.3d at 118. Further, the ALJ adequately explained the supportability and consistency of the opinions of Dr. Popat and Dr. Draper. (Doc. 12-2, at 17-18). As such, substantial evidence supports the ALJ's use of the medical opinions of Dr. Kovatch, Dr. Popat, and Dr. Draper as the ALJ utilized a wide array of evidence from the record in his analysis of J.J.V.'s functional domains.

## V.   CONCLUSION

Based on the foregoing, **IT IS ORDERED** that the Commissioner's decision to deny Vizcarrondo disability benefits be **AFFIRMED,** final judgment be issued in favor of the Commissioner, and the Clerk of Court be directed to **CLOSE** this case.

An appropriate Order follows.

Dated: August 5, 2022                               *s/ Karoline Mehalchick*
                                                    **KAROLINE MEHALCHICK**
                                                    **Chief United States Magistrate Judge**